```
                  UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
                       FORT MYERS DIVISION

ABDUL HAKEEN JAHMAL NASEER
SHABAZZ aka Owen D. Denson,
Jr.,

        Plaintiff,

v.                                Case No:  2:17-cv-648-JES-NPM

RICKY DIXON,

        Defendant.
```

## OPINION AND ORDER

This matter comes before the Court on Defendant's Motion for Summary Judgment (Doc. #188), Plaintiff's Response (Doc. #196), and Defendant's Reply (Doc. #198). For the reasons set forth below, the motion is denied.

**I.   Background**

This is a civil rights case based on the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc - 2000cc-5 (RLUIPA). Plaintiff Abdul Hakeen Jahmal Naseer Shabazz is a prisoner of the Florida Department of Corrections (FDOC) serving a life sentence for robbery with a deadly weapon, and he is a devout Sunni Muslim. He claims the FDOC's grooming policy, which prohibits inmates from growing beards longer than half an inch, unlawfully interferes with his right to freely practice his

religious beliefs.  Defendant Ricky Dixon is the Secretary of the FDOC.

Florida Administrative Code Chapter 33-602.101 sets out the FDOC's grooming rules.  The relevant part states, "All inmates shall elect either to be clean shaven or to grow and maintain a half-inch beard."  Fla. Admin. Code Ch. 33-602.101(4).  That chapter of the code includes other rules that limit inmates' grooming options, but the Court will refer to the above-quoted sentence as the "grooming policy" throughout this Order.

Shabazz's Fourth Amended Complaint (Doc. #138) alleged that maintenance of a fist-length beard was central to his religious beliefs.  The Court granted Shabazz a temporary restraining order on July 10, 2020, and a preliminary injunction on July 24, 2020, enjoining FDOC from enforcing the grooming policy to prevent Shabazz from maintaining a fist-length (four-inch) beard.  (Docs. #142 and #152).  Then, during a deposition, Shabazz stated that his faith requires him to grow a free-flowing beard.  (See Doc. #174).  The allegations relating to a fist-length beard were the result of a miscommunication with his counsel.  With the Court's leave, Shabazz filed a Fifth Amended Complaint, alleging the FDOC violates the RLUIPA by prohibiting him from growing a free-flowing beard.  (Doc. #178).

**II.  Legal Standard**

Summary judgment is appropriate only when the Court is

satisfied "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden falls on the movant, who must identify the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To defeat summary judgment, the non-movant must "go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material facts exists." Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006).

In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences drawn from it in the light most favorable to the non-movant. See Battle v. Bd. of Regents, 468 F.3d 755, 759 (11th Cir. 2006).

**III. Analysis**

The RLUIPA allows prisoners to seek religious accommodations from prison officials:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and

> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Congress intended the RLUIPA's protection of religious liberty to be expansive. It defined "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Courts must construe the RLUIPA "in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." § 2000cc-3(g). And the RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." § 2000cc-3(c).

### A. Exhaustion of Administrative Remedies

Dixon first argues Shabazz failed to exhaust his administrative remedies. The Prison Litigation Reform Act (PLRA) prohibits prisoners from bringing a civil action "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). It is undisputed that Shabazz exhausted the FDOC's grievance procedures, but Dixon claims he was also required to challenge the grooming policy by filing a petition to initiate rulemaking under Florida's Administrative Procedure Act. Florida Statutes § 120.54 allows "Any person regulated by an agency or

having substantial interest in an agency rule" to "petition an agency to adopt, amend, or repeal a rule."

To support his failure-to-exhaust argument, Dixon cites an excerpt from Smith v. Conner:

> Defendants argue that Plaintiff did not exhaust all administrative remedies available to him because he failed to file a petition to initiate rulemaking pursuant to Florida Statutes, Section 120.54(7) prior to filing his complaint in this action. Specifically, Defendants argue that because Plaintiff seeks to amend Florida Administrative Code Chapter 33-602.201, which regulates inmate property, he was required to not only exhaust the prison grievance procedure, but also file a petition to initiate rulemaking under 120.54(7).
>
> The Court agrees, in part, with Defendants' failure to exhaust argument. To the extent Plaintiff requests the Court order Defendants to make "the necessary additions to the inmate property list to allow necessary items [,]" the Court agrees that Plaintiff is attempting to alter a Department rule, specifically Rule 33-602.201, and therefore was required to initiate rulemaking under 120.54(7). To the extent, however, Plaintiff claims that Defendants have failed to provide him with adequate protection from the cold and wet weather, and adequate storage space, the Court finds that Plaintiff has fully exhausted his available administrative remedies through the prison grievance procedure.

No. 8:12-cv-52-T-30AEP, 2014 WL 299099, at *7 n.6 (M.D. Fla. Jan. 28, 2014).

This case differs from Smith because Shabazz is not seeking to alter an FDOC rule. The Fifth Amended Complaint makes clear that Shabazz seeks an exception from—not a change to—the grooming policy. (See Doc. #178 at 6-7). Because Shabazz is not seeking adoption, amendment, or repeal of a rule, he had not reason to

file a petition to initiate rulemaking. His exhaustion of the FDOC grievance procedures satisfied the PLRA's pre-suit requirements.

### B. Merits of Shabazz's RLUIPA Claim

Under the RLUIPA's burden-shifting framework, a plaintiff must show that (1) his relevant religious exercise is "grounded in a sincerely held religious belief" and (2) the challenged government policy "substantially burden[s] that exercise" by forcing the plaintiff "to 'engage in conduct that seriously violates [his] religious beliefs.'" Holt v. Hobbs, 574 U.S. 352, 361 (2015) (quoting Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 720 (2014)). The burden then shifts to the government to show that its action or policy is (1) in furtherance of a compelling governmental interest; and (2) the least restrictive means of furthering that interest. Id. at 362. "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." Holt, 574 U.S. at 364 (quoting Hobby Lobby, 573 U.S. at 728) (cleaned up).

The RLUIPA requires the Court to focus its inquiry on Shabazz and his particular circumstances, rather than the general legality of the FDOC's grooming policy. Id. at 362-63. To satisfy its burden, the FDOC must "demonstrate that the compelling interest

test is satisfied through application of the challenged law" to Shabazz. Id. at 363 (quoting Hobby Lobby, 573 U.S. at 725). The Court must scrutinize the asserted harm of granting a specific exemption to Shabazz and "look to the marginal interest in enforcing" the FDOC's grooming rule in this particular context. Id.

Dixon does not dispute that Shabazz's sincerely held religious belief requires him to maintain an untrimmed beard or that the grooming policy substantially burdens Shabazz's exercise of that belief. Rather, Dixon claims he is entitled to summary judgment because the grooming policy is the least restrictive means of furthering compelling governmental interests. For his part, Shabazz does not contest that the grooming policy furthers compelling governmental interests. Thus, the critical question is whether applying the grooming policy to prevent Shabazz from maintaining a free-flowing beard is the least restrictive means of furthering compelling government interests.

Much of Dixon's argument broadly defends the grooming policy and anticipates problems that might arise if the FDOC allowed not just Shabazz but thousands of other Muslim inmates—and perhaps inmates of other faiths—to grow untrimmed beards. But the issue here is more focused—Dixon must prove that denying an exemption to Shabazz is the least restrictive means of furthering the FDOC's interests. See Smith v. Owens, 848 F.3d 975, 980 (11th Cir. 2017).

Dixon identifies three governmental interests served by the grooming policy. First, the policy serves security and safety interests because inmates can use untrimmed beards to hide contraband—like handcuff keys, cell phone SIM cards, and razor blades—and can shave a beard after an escape to avoid identification. Shabazz is in his 70s and has a checkered disciplinary history from his 45 years of incarceration. He has committed dozens of disciplinary infractions, including assaults, at least 11 instances of hiding contraband, and an escape attempt. (Doc. #188-1 at 4). Dixon only provides details of one recent infraction—in May 2020, Shabazz "failed to address staff properly and turn[ed] his back on the Chief of Security." (Id.)

Second, the grooming policy serves hygiene and health interests. Officers would need to be near Shabazz to search his untrimmed beard, which increases the risk of Shabazz catching or spreading COVID-19. Also, beards can make it difficult to properly wear a face mask, which reduces effectiveness. Shabazz is at high risk of the virus due to his age and medical history, and he has contracted COVID-19 before. (Doc. #188-2 at 1).

Third, FDOC has an interest in conserving its limited resources. Carl Kirkland, FDOC's Deputy Director of Internal Operations, lays out a slippery slope of expenses the FDOC might incur if it grants Shabazz an exception to the grooming rule. He predicts it would cost $8 million in direct costs the first year.

(Doc. #188-1 at 7). Kirkland's estimate assumes 5,000 inmates would be allowed to grow untrimmed beards, and it accounts for increased man hours to search beards and equipment like metal detectors and disposable hair picks. (Id. at 5-7). The argument that granting Shabazz an exception from the grooming policy would lead to 5,000 untrimmed beard and more than $8 million in annual costs is far too speculative to be the basis of summary judgment. In fact, Dixon has not pointed to any evidence that Shabazz's Court-ordered right to grow a four-inch beard has led to the types of expenses Kirkland predicts.

Shabazz relies primarily on his expert witness, John Clark, to show the availability of less-restrictive measures. Clark reports that other prison systems have successfully implemented alternative means of serving the interests raised by the FDOC while allowing inmates to grow beards. Dixon challenges Clark's qualifications because he is not an expert in FDOC policy, but he does not challenge Clark's expertise in prison administration generally. Clark need not be an expert in FDOC policy to opine about policies adopted by other prison systems.

Clark describes alternative, less-restrictive means to address the FDOC's interests. First, prison officials can search a beard without touching it by waiving a metal detection wand over the inmate and/or requiring the prisoner to run his fingers vigorously through his hair and beard. (Doc. #196-3 at 16). Such

a search can be conducted in a few seconds. (Id.) This search method could satisfy the FDOC's interest in checking Shabazz for contraband without requiring prison officials to get closer to Shabazz than is necessary for an ordinary search, so it also serves the FDOC's health concerns. And the cumulative extra time spent searching Shabazz's beard would likely be less than a minute a day. Dixon disputes the effectiveness of this suggestion, but that is an issue for the factfinder to resolve at trial.

Clark also provides an alternative means to address FDOC concerns about inmates shaving beards to avoid detection during or after escape attempts. He describes the Federal Bureau of Prisons' practice of taking new photos of inmates at regular intervals and retaining all past photographs. It follows that FDOC could take a photograph of Shabazz without his beard—if they do not have one already—and take and retain photographs of Shabazz at regular intervals as his beard grows. Clark notes that other prison have shifted the costs of new photographs onto the inmates and have revoked exceptions for inmates who continuously alter their appearance. (Doc. #196-3 at 19).

Dixon has not established that he is entitled to judgment as a matter of law because factual disputes remain as to whether prohibiting Shabazz from growing an untrimmed beard is the least restrictive means of furthering the FDOC's interests.

Accordingly, it is hereby

**ORDERED:**

Defendant's Motion for Summary Judgment (Doc. #188) is **DENIED.**

**DONE and ORDERED** at Fort Myers, Florida, this 5th day of April 2022.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

SA: FTMP-1

Copies:
Counsel of Record

- 11 -